**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SidePrize LLC d/b/a PrizePicks,<br>*Assignee of Richard Baccellieri*<br><br>Plaintiff,<br><br>v.<br><br>Vetnos, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **COMPLAINT**<br><br><br><br><br><br>Case No.: 1:26-cv-07225 |

# COMPLAINT

Plaintiff SidePrize LLC d/b/a PrizePicks ("PrizePicks") files this Complaint for correction of inventorship against Defendant Vetnos, LLC ("Vetnos"), under the patent laws of the United States, 28 U.S.C. § 2201 and 35 U.S.C. § 256, for U.S. Patent Nos.: 10,353,543 (the "'543 Patent," **Exhibit A**); 11,042,264 (the "'264 Patent," **Exhibit B**); 11,157,147 (the "'147 Patent," **Exhibit C**); 11,579,754 (the "'754 Patent," **Exhibit D**); 11,465,057 (the "'057 Patent," **Exhibit E**); 11,839,822 (the "'822 Patent," **Exhibit F**); 11,977,718 ("'718 Patent," **Exhibit G**); 11,886,688 (the "'688 Patent," **Exhibit H**); 12,112,017 (the "'017 Patent," **Exhibit I**); 12,394,278 (the "'278 Patent," **Exhibit J**); 12,521,636 (the "'636 Patent," **Exhibit K**); 12,544,649 (the "'649 Patent," **Exhibit L**); 12,544,650 (the "'650 Patent," **Exhibit M**) (each a "Patent" and, collectively, the "Patents"). PrizePicks is the owner by assignment of Richard Baccellieri's rights as at least a co-inventor of the Patents.[1]

## I. OVERVIEW

1. This case is brought to correct the inventorship of the Patents, which relate to

[1] In bringing this suit, PrizePicks does not concede that the Patents are valid.

games, such as "skill-based games" or games in the fantasy sports industry. Richard Baccellieri should be named as a co-inventor on each of the Patents because of his substantial contributions to the conception of one or more claims of each Patent.

2. Baccellieri is not currently named on the Patents because he was wrongfully and fraudulently omitted by Daniel Orlow, the president and founder of Vetnos, the current owner of the Patents. Orlow was also a founder of Line Gaming Holdings Corporation ("LGC"), the company at which the ideas for the Patents were first conceptualized. For years, Orlow has falsely portrayed himself as the key inventor of these Patents, even listing solely himself as inventor on some of the Patents despite the significant contributions of others.

3. Orlow omitted Baccellieri's name from the Patents for one reason: money. Because Baccellieri never assigned his ownership rights in the Patents, naming him as a co-inventor would prevent Vetnos from attempting to monetize the Patents through litigation against fantasy sports companies that have found the commercial success that has always eluded Orlow's ventures.

4. The Patents' origins date back to 2013, before Vetnos was formed. At that time, Orlow was working at LGC, which he had co-founded with Joseph Brennan. In 2014, LGC changed its name to Game Sports Network ("GSN").[2]

5. At the time, Orlow had no background in fantasy sports or gaming. He was educated in history, East Asian studies, and law; and his career to that point had been in financial services. By contrast, Brennan, the co-founder of LGC, had extensive prior experience in the gaming industry.[3]

---

[2] Any reference in this Complaint to LGC or GSN should be construed as the appropriate moniker for the date involved.

[3] Orlow also improperly omitted Brennan as an inventor of the Patents. That omission is not the subject of this lawsuit.

6. Likewise, by this time, Baccellieri was an experienced lines-making professional who had managed sportsbooks at major properties in Las Vegas including MGM Grand, Caesars Palace, and Palms Casino Resort. In 2024, Baccellieri was inducted into the SBC Sports Betting Hall of Fame.

7. Starting around 2013, Baccellieri began working with LGC. During his time with the company, Baccellieri contributed to the conception and development of a parlay-style fantasy-sports game with fixed odds. GSN would later market this game as "HotRoster" and reduce its concepts to the Patents. The Patents are based, in part, on Baccellieri's work and ideas.

8. In 2017—after both Baccellieri and Brennan stopped working for GSN—GSN changed its name to Avaago, Inc. ("Avaago") and then went bankrupt.

9. In or around 2018, Vetnos acquired some or all of Avaago's assets, including the rights to certain of the Patents or applications that led to certain of the Patents.

10. In June 2026, Baccellieri assigned to PrizePicks all ownership rights he has in the Patents (the "Assignment," **Exhibit N**).

## II. PARTIES

11. Plaintiff PrizePicks is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 1055 Howell Mill Road, Atlanta, GA 30318. PrizePicks is the assignee of Mr. Baccellieri's rights as a co-owner of the Patents.

12. Defendant Vetnos is a limited liability company organized and existing under the laws of Delaware having its principal place of business at 369 Lexington Avenue, Suite 208, New York, NY 10017.

## III. JURISDICTION

13. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331

and/or 28 U.S.C. § 1338.

14. This Court has personal jurisdiction over Vetnos, including because Vetnos' headquarters is in this District.

15. A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District, as LGC and GSN were also headquartered in Manhattan.

16. This action has been timely filed pursuant to 35 U.S.C. § 256, which has no cut-off date for correction of inventorship.

## IV. FACTUAL ALLEGATIONS

17. In 2011, Joseph Brennan and Daniel Orlow co-founded LGC and sought to enter the sports-betting market. Brennan had significant experience in the gaming industry, while Orlow had none. Eventually, LGC shifted its focus from sports betting to fantasy sports.

18. At some point after its formation, and at least as of 2013, LGC began working with Richard Baccellieri. Baccellieri had significant experience in lines setting, among other aspects of the gaming industry. By that time, he had managed the sportsbooks for properties such as MGM Grand, Caesars Palace, and Palms Casino Resort, and he was the first to implement Rapid Bet (a then-innovative in-game wagering platform that allowed bettors to place wagers after a game had begun using continuously updated real-time odds) at Palms Casino Resort in 2006.

19. With Baccellieri's input and guidance, LGC began developing a fixed-odds, parlay-style fantasy-sports game involving athlete matchups. In the game, a user would be presented with a series of athlete matchups and select the athlete in each matchup who the user thought would score more fantasy points. The user would win a predetermined payout if all his selections were correct.

20. As of early 2013, the primary people involved in LGC's development of the fixed-odds fantasy game included Brennan and Baccellieri. Kenneth ("Kenny") White, a named inventor

on several of the Patents, was not yet working at LGC, and several other named inventors on the Patents were also not yet involved.

21. In or about April 2013, Brennan introduced White and Orlow. In or soon after April 2013, White began working with LGC. Like Baccellieri, White had a long history in the sports gaming industry—by the age of 24, White was running a sportsbook, and at 26, he was setting lines for some of the biggest casinos in Las Vegas.

22. In 2013, Brennan, White, and Baccellieri substantially contributed to the conception of the parlay-style fantasy sports game LGC was developing, and they collaborated with one another concerning the conception. They also collaborated with Orlow (either directly or indirectly through others) concerning their contributions.

23. By July 2013, White and Baccellieri had discussed at length key features of the parlay-style fantasy sports game. For example, Baccellieri contributed to the idea that the game should include a fixed pay table and that the game should present player matchups of equal chance. At a minimum, these ideas amounted to substantial contributions to the conception of one or more claims in each of the Patents, including the following claim limitations:

a. The claims of the ’543, ’147, and ’754 Patents require “fixed-payout odds”; claims 1, 8, and 15 of the’264 Patent require a “fixed-payout amount”; the ’688 Patent claims require a “fixed odds payout”; claims 9, 19, and 29 of the ’017 Patent require “based on a fixed odds prize table, a fixed odds prize to award to the at least one user”; the claims of the ’057 Patent claims require an “assigned fixed odds payout”; the claims of the ’822 Patent require a “progressive fixed odds payout”; claims 1 and 11 of the ’278 Patent requires a “fixed odds prize table”; claims 1 and 15 of the ’636 Patent require an “an assigned fixed odds payout at a discount from a fair value of an expected payout that

assumes each skill-based play of the advanced choice game has equally probable outcomes"; and claim 19 of the '650 Patent requires a "fixed-odds value."

b. The independent claims of the '057 and '822 Patents all require that "each skill-based play of the advanced choice game has equally probable outcomes"; the independent claims of the '017 Patent require "outcomes that are generally equally weighted and are, as a result, equally probable to occur within the skill-based game"; claims 1, 8, and 15 of the '264 Patent require "evenly balanced matchups"; claim 1 of the '718 Patent requires "outcomes that are generally equally weighted" and "as a result, equally probable to occur"; claims 1 and 11 of the '278 Patent require outcomes that "are generally equally weighted within the skill-based game"; claims 1, 14, and 20 of the '649 Patent require "includes at least two components associated with at least one participant in one or more real-world events that are selected so as to produce weighted outcomes that are generally equally weighted within the skill-based game"; and claims 1, 14, and 20 of the '650 Patent require "at least two components being expected to produce, based at least in part on the at least one projected performance score of the at least one participant, weighted outcomes that are generally equally weighted."

24. According to Orlow and Vetnos, fixed odds and equally probable matchups are the key aspects of the claimed inventions to some or all the Patents. For example:

a. Vetnos has said that the "beating heart" to the claimed inventions is the ability to select equally probable matchups.

b. Vetnos has said that, prior to GSN's game, "there were no fixed odds daily fantasy sports games on the market," rather, "fantasy sports games were all burdened with a pari-mutuel format."

c. In a 2018 declaration submitted to the United States Patent & Trademark Office ("PTO") in conjunction with the application that led to the '543 Patent, Orlow emphasized how the "fixed odds" concept was a key—and unique—aspect of the patented game. He represented that the game, unlike "conventional betting," "does not depend on how well one participant does relative to another participant…." He also represented that the prior art "does not "disclos[e] or suggest[]" "'fixed payout odds' for a user who successfully selects the winners in a slate of matchups wherein 'determination of whether a given user is a winner or loser is based solely upon the given user's selections and not on those of other users.'" Those and similar representations made in the declaration were made to overcome rejections made by the PTO to the patent application—and they successfully overcame the PTO rejections.

d. Vetnos has stated that the Patents' supposedly new fixed-odds format differs from both prior daily fantasy games and prior sports betting because the prior offerings were games in which a determination of who won (and much was won) depended on how well one user did relative to others.

25. The importance of the fixed-odds nature of the game, as well as equally probable matchups, is also reflected in the text of the Patents. On September 8, 2014, GSN filed U.S. Provisional Application No. 62/047,473 ("2014 provisional"). The 2014 provisional was titled, "Method and System for Presenting and Operating a Skill-Based Activity." This provisional patent would later issue as the '543 Patent, which itself is related to many of the other Patents. Baccellieri's contributions related to fixed-odds payouts and 50/50 matchups are described in the '543 Patent as required elements of the invention. For instance, the specification of the '543 Patent says:

a. "[T]he present invention **requires** a fixed payout table and each fan has an opportunity to win against the system. This is in contrast to other games, such as pari-mutuel games, where fans play against other fans and payouts are based upon the amount of money that fans associate with their selections." (emphasis added).

b. "[I]n order to ensure that the result or outcome of correctly picking the result of a matchup requires a substantial amount of skill from the fan, **each matchup is preferably generated so that the pairings are generally equal or equally weighted**, such as pairing equally matched players. In other words, players with similar skill or ability to play the sports event are preferably matched in the matchups." (emphasis added).

26. The specifications of all the Patents include that same language.[4]

27. The claims of the Patents also recite the use of computer equipment to implement the fixed odds and/or equally probable concepts. But neither the Patents' claims nor their specifications indicate that the purported invention makes any improvements to computing devices or operations. Instead, the Patents merely use conventional computing equipment as tools to carry out the fixed-odds concept.

28. Because of at least the above facts, Baccellieri made substantial contributions to the conception of at least one claim in each of the Patents.

29. Around the time of the filing of the above-referenced provisional application, GSN was urging co-inventors to assign their rights in the patent to GSN.

30. Neither Brennan nor Baccellieri agreed to assign their rights to GSN.

31. GSN took no steps to remedy its failure to name Baccellieri as an inventor on the

[4] The '057, '822, '636, '649, and '650 Patents incorporate the '543 Patent in its entirety by reference.

’543 application. GSN, Vetnos, and Orlow also improperly failed to name Baccellieri on the applications for the remaining Patents.

32. Baccellieri made substantial contributions to one or more claims in each of the Patents. Indeed, Baccellieri collaborated with other inventors of the Patents about his contributions, including White, and conveyed ideas about what should be in GSN’s offering to at least Orlow, either directly or through others. Orlow is a named inventor on each Patent.

33. Baccellieri is, and has always been, a co-inventor of the Patents. Nonetheless, GSN and later Vetnos and Orlow failed to name Baccellieri as an inventor on any of the Patents.

**CAUSE OF ACTION UNDER 35 U.S.C. § 256**

34. PrizePicks realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this Cause of Action.

35. As detailed above, Baccellieri made substantial contributions to the conception of at least one claim of each Patent.

36. As detailed above, Baccellieri collaborated directly with White; and he collaborated with each of the other co-inventors—either directly or indirectly through others. For example, he was working with LGC in 2013 on the idea that led to the Patents and HotRoster, and Orlow (as one of LGC’s executives and directors) was helping oversee the work of the other co-inventors throughout 2013 and 2014. Baccellieri’s contributions were incorporated into others’ work as a result.

37. Baccellieri’s inventorship of subject matter claimed in the Patents is corroborated by email correspondence, as well as by persons involved in the development.

38. Baccellieri is wrongfully omitted as an inventor on each of the Patents.

39. PrizePicks owns all of Baccellieri’s ownership rights to the Patents.

## REQUEST FOR RELIEF

PrizePicks respectfully requests that the Court enter judgment in its favor, and against Defendant Vetnos, and that the judgment includes the following relief:

a. The Court directs the U.S. Patent and Trademark Office to issue a Certificate of Correction to correct inventorship of the Patents pursuant to 35 U.S.C. § 256;

b. The Court instructs Defendant to take all reasonable and necessary actions to obtain such correction; and

c. The Court grants all such other and further relief as it deems just and proper, including any relief necessary to effectuate an inventorship change pursuant to 35 U.S.C. § 256.

Dated: August 24, 2026

Respectfully submitted,

By: */s/ Jesse Panuccio*

Jesse Panuccio (*pro hac vice* pending)
David Costello (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
jpanuccio@bsfllp.com
dcostello@bsfllp.com

Andrew Villacastin
Alexander Law
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
20th Floor
New York, NY 10001
Tel: (212) 909-7628
avillacastin@bsfllp.com
alaw@bsfllp.com

Eric J. Maurer (*pro hac vice* forthcoming)
Cameron Miller (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005

Daniel Huynh (*pro hac vice* forthcoming)
Eliza del Carmen (*pro hac vice* forthcoming)
BRADLEY ARANT BOULT CUMMINGS LLP
1230 Peachtree Street NE, 21st Floor
Atlanta, GA 30309
dhuynh@bradley.com
edelcarmen@bradley.com

Tel: (202) 237-2727
emaurer@bsfllp.com
cmiller@bsfllp.com

*Counsel for Plaintiff SidePrize LLC d/b/a PrizePicks*